Well so I represent Darrell Connor. He's brought multiple death claims for the death of his father, Connor, and his wife, Emma. We're asking the court to reverse summary judgment of Covil Corporation. Yeah, this is not, this is not working. Yeah, maybe we can disconnect you and bring you back on. Can you, Anisha, can you do that or see what we can do? Yeah, we'll pause the time and start it over. Okay, thank you. Hang on one second. Let me hear your voice again. Go ahead. Can you hear me? My name is Lisa Shirley. We can hear you when you move closer to the screen, but the minute you start stepping away, it becomes a problem. Okay. So what, I'm not sure what you heard before, but what we're asking the court to do in this case is to reverse the summary judgment that was granted to Covil Corporation. Are you able to hear me all right? Thank you. District Court improperly weighed the evidence in the case and also drew inferences, not in our favor, but in favor of Covil Corporation. Court also failed to consider evidence regarding excessive exposure levels and our expert causation evidence. I think it's helpful to divide the evidence into three general categories for this discussion. The first category is our fact witness testimony regarding Pete Conner, the job that he did in the cyber industry, and the way he was exposed to his justice from Covil-complied installation. That testimony included what his job was, included testimony from insulators, testimony how close he was, how he interacted on almost a daily basis with those insulators. Actually, I don't recall actual testimony. This is Judge Thacker. I don't recall testimony saying that he interacted on a daily basis with insulators, and even when he did step out of Building P where he did most of his work, I don't recall him seeing insulators on a regular basis or stopping to interact with them on a regular and frequent basis. What is your best evidence of that in the record? Yes. So his own testimony was that he saw the Daniel workers several times a day. We also had several types of interactions. But seeing the Daniel workers and seeing the Daniel workers when they were working on insulation and stopping and being exposed to that are two different things, aren't they? Yes. So what I was going to say was that he had multiple reasons to be interacting with Daniel insulators. He had testified that if the Daniel insulators were doing something that would impact the trainers that he supervised, he would intervene. He also said that sometimes when certain repair work was needed that Daniel was going to be doing, that he had to be giving permissions for that repair work, and that would involve some back and forth with the insulators. He also testified about having to actually show the Daniel workers how to do certain kinds of repairs on equipment called the Krell. In addition to that, he was friends with the Daniel insulators. His coworker, Troy Witherspoon, testified that he would stop and talk because they had become friendly because they worked together. Witherspoon obviously worked with Connor. Well, they saw each other on a daily basis. They were both in the training department. And he verified what Connor said about how he would be out in the main production department. And every day Witherspoon was certain that Connor would have been within two feet of Daniel insulators one to three times per week. And this was not just because they had similar jobs in the training department. He said that this was because he personally observed Connor in the main production area, and also personally observed the Daniel insulators. So in terms of that, in terms of the Lorman test, so obviously the court knows that's the frequency, regularity, and proximity test that's going to be applied for causation in this case. All of those things that were regular parts of his job that brought him into close contact with Daniel workers, that satisfied frequency and regularity factors for Lorman. The duration of this was 16 years. He was at Fiber Industries. Mr. Connor was at Fiber Industries from 1966 to 1982. Proximity, as I mentioned, he would have been talking with the Daniel insulators many times, sometimes multiple times a day. That was within two feet, according to his co-worker. And we also had testimony about what those insulators were doing when he was there. The Witherspoon testified that the Daniel workers were primarily doing insulation work. That it would be dusty, that they would be doing it right there in front of everybody. The Daniel insulators, they had three Daniel workers. Ms. Shirley, Mr. Connor, when he was asked, I think it was at his deposition, about where he would have been exposed to asbestos during his work life, he didn't mention Coble, did he? He mentioned doing railroad. By the time he worked for the railroad as a machinist mechanic, working on the steam engines. He didn't mention Coble, correct? So what are we to do with that? Well, I think that was his initial reaction. That was his memory. He was 90 years old when he gave his testimony. Because he worked much longer at the railroad. Well, not much longer, but longer. He worked a long time, 19 years, maybe, at the railroad. With direct hands-on experience as a machinist mechanic on the steam engines and boilers. Directly working with asbestos, as compared to working in the training department and building P, that he described as clean as your own home, in Coble. What are we to do with those two competing work environments? Okay, well, first of all, he did have more, I would say, intense exposure at Southern Railroad. He didn't really work there longer, and he didn't work around asbestos insulation longer. It was about a seven-year period that he worked around insulation when they used steam locomotives. This was in the late 40s and the early 50s. And he said when they changed over to diesel, they didn't use asbestos insulation anymore. But it was a more intense, frequent exposure at Southern Railroad. But that doesn't mean that he didn't also have actually very high exposures at fiber industry. This is the same type of product. Asbestos insulation causes extremely high exposure levels, even to bystanders, even to people that weren't working with the product. He wasn't working with it at Southern Railroad, either. He was a bystander to the insulation there, as well. Ms. Shirley, do we know where in the facility this particular asbestos was actually installed and or stored? Well, the testimony was that it was all over the plant. It was on every high-temperature pipe. There were miles and miles of pipes to the plant. Most of the insulation used in the plant was asbestos. That was the evidence that we had. And Daniel, that's what they did. So, if you're talking to Daniel Worker, it's going to be next to asbestos insulation. In terms of where it was stored, there was testimony that he stored it basically in an open area in the plant. And they would sometimes cut it out in the plant in front of their workers. The Daniel insulator said that they were cutting and installing insulation within three or four weeks of the work. They didn't really cordon off the area normally. They didn't use any precautions to keep down the pests. They even said, a couple of them said, that the pests would be physically drifting out into the plant. We're not really saying what was sort of suggested. Well, he was just walking through the plant, and that was exposure. That's not really what that was. But he was coming up within a few feet of them several times a day, doing various interactions with the tattoos. And so, he was directly exposed during those interactions within several times a day. Counsel, sorry, it's Judge Harris. Can I ask you a question? So, as I understand, I mean, a big part of your argument is that the district court wasn't looking at the record in the light most favorable to the plaintiff. But if one did, you think we would get to Mr. Conner being on the plant floor regularly within feet of the Daniel insulation workers. There's at least some interaction a couple of times a week. Is it your position that that's enough to satisfy Lorman, regardless of whether we take account of the specific disease at issue? Or is it that that's enough if we also take account of the fact that this is mesothelioma? You know, so that you don't have to be quite as close, and it's in the air, and you are more easily exposed to it. Do we have to take account of that also? Or do you think this goes to a jury, even if we don't? I think it goes to a jury. But I also think that it's a consideration that should be a factor. But we do think it goes to the jury, even if we don't. And, you know, we're obviously not testing the Lorman, and those Lorman factors apply. Ms. Shirley, can you get a little closer to your mic? Yeah, go ahead. We're not disagreeing that Lorman applied in the case or anything like that. But this is actually quite comparable to several other cases from this court that have relied on co-worker testimony, circumstantial evidence, and held that that was sufficient under Lorman. And I would just quickly direct the court to the Rowling case, 786 F. 2nd. 1225. Also, the Haislip v. Owens Corning fiberglass case, 86 F. 3rd. 1150. That case is a really interesting one because the plaintiff, that went to a jury, and it had a plaintiff's verdict. It was an appeal from a plaintiff's verdict. And there, the plaintiff, who had, you know, eventually passed away, he had denied that he had exposure to KALO asbestos pipe insulation. But his co-worker said, no, we did. For nine months, we worked around insulators, and they were constantly cutting and installing KALO right around us. And the defendant had appealed that, saying, well, this guy is incredible because he was friends with the plaintiff, and because he had been shown a photograph of KALO. He didn't remember it until he was shown a photograph of KALO. In Haislip, the court said, no, that evidence was sufficient to reach a jury and create an issue of fact because it's for the jury to be assessing the credibility of witnesses. So that is another case, I think, in line with the type of evidence that we have here. Also, Shetterly v. But when you're saying it's in line with the type of evidence we have here, you're saying it's because it's co-worker evidence, correct? Because not necessarily the same type of duration and frequency, because even when you just described that case, it was nine months of frequent contact with insulators. That's not the same sort of contact by either duration or frequency that we have here. It might be co-worker testimony, but the frequency and duration is not the same. Would you agree with that? I do agree, but we had a longer duration here. We had 16 years of court daily interactions. Did you say daily interactions? Yes, Your Honor. I mean, the testimony, even that the district court had relied on, said that he saw them several times a day. And like I said, the fleshed out testimony was that included talking to them. But I did want to address the issue. Did it include talking to them while they were installing asbestos? Well, I think that's an inference that has to be drawn. Okay, well, that's a big inference. Well, I mean, that's what they were doing, and they said that they were doing that around other workers. We also had evidence in the record that the trial court didn't consider about these asbestos exposure levels that you would have. They're extremely high exposure levels, even for people who are standing next to the people while they're doing work. The fibers remain suspended in the air. So if they stopped five minutes before he approached, there would still be a lot of asbestos fibers in the air. It's important to note that. Our scientific evidence was, we had a study. Counsel, I'm sorry. Counsel, can I ask you a question about the scientific evidence and the expert report? And I don't know if you can answer this question or if it's really for you. But I just didn't understand quite what was going on when the district court said that the Dauber challenge to your expert witness was moot. Because I think you actually started out trying to explain the different buckets of evidence you had. And it seemed to me that what the district court said was that your fact witness testimony wasn't enough to generate a material issue of fact as to causation for the jury. So therefore, she didn't have to consider whether your expert testimony did. And I didn't understand that. Why was the Dauber challenge moot? Well, her reasoning was exactly what you just said. Because we had not shown exposure, she didn't reach the admissibility of our expert causation opinion. But she didn't reach any of the, or she didn't consider any of the evidence that had been included in our expert report. She has like a 30-page expert report that has all this information in it about exposure levels that were never inviting the risk of bystanders, et cetera, that were never, it was never contradicted by Coble, never challenged in a kind of Daubert way by Coble. She just didn't consider that. And then also, she didn't reach his causation opinion saying that, you know, that, yeah, that it was moot. So we, my three categories were, you know, the fact that it was testimony, that scientific evidence, the exposure levels, and fiber drift, and the risk of bystanders. And then my third category, which was not, neither one of those was challenged, you know, in any kind of admissibility way. But the third category, there was a Daubert moot. And our position is that if she wasn't going to agree with our other two categories of evidence, she should have reached that expert issue and considered whether that would have been helpful. Okay. Thank you, Ms. Shirley. Mr. Lynn, we'll hear from you. Thank you, Your Honor. Good afternoon, and may it please the Court. My name is Albert Lynn, and I'm here on behalf of Coble Corporation. I'd like to start by sort of teasing out the fact that there are actually two different questions in this case in Judge Harris. I think it answers, in part, what you were asking about in terms of the Daubert challenge. There's two different questions. And I think the first, if you answer it the way that we think it should be answered, moots. The threshold question here in this case is about actual exposure. And I think the second question is, if you find that there is enough evidence to go to the jury on actual exposure, then there's a question of quantity of exposure and how much evidence is required to get to the jury on the quantity issue. And the expert testimony, Judge Harris, I think goes to the quantity question. So, on the threshold question of actual exposure, again, I think that the question there is, is there evidence in the record from which a jury could reasonably conclude that Mr. Connor was exposed at all to asbestos dust at the Fiber Industries plant? And I think both parties agree that that's not really a Lorman. It is in part a Lorman question, but it's not about frequency, regularity, and proximity. It's governed by rolling, which plaintiff himself cites to at pages five to six of his reply. And the rolling question is, because there's no evidence here of anybody having seen Mr. Connor being exposed to asbestos dust, Mr. Connor himself says, and Judge Thacker, as you pointed out, the plaintiffs say, well, he's 90 years old, but he remembered in vivid detail the 20 years that he spent at the railroad being covered in asbestos dust. And the type of work he was doing, having it all over his clothes, coming home, and now he had to remove it from his clothes. He doesn't testify to being exposed to asbestos dust. He doesn't even mention asbestos dust at the Fiber Industries plant. And so, under the rolling question, there's two parts to it. You need evidence to show that there's airborne asbestos somewhere. And then you need evidence to show that the individual we're talking about was within the vicinity of that airborne asbestos, such that he breathed that dust. That's what rolling says. And I think, which you heard from Ms. Shirley today, and what we see in their briefs, it turns critically on this two-feet testimony from Mr. Witherspoon. I mentioned it seven times in their briefs. She mentioned it a number of times today. Because there's no other testimony that even purports to put Mr. Connor near enough to the Daniel and scholars that he would have been inhaling this asbestos dust. It really turns on that two-feet testimony. And – But I'm sorry, but can I just – I guess I'm having trouble understanding why this isn't the Lorman question. You're saying – because I couldn't find really – like, Lorman doesn't talk about this as a two-step inquiry. Most of our cases certainly don't. Why – so you want us to consider proximity, but consider it not under Lorman, under some separate test. A pre-Lorman test. Is that what you're talking about? Yes, Your Honor. Because I think rolling talks about that, which was issued at the same time as Lorman. And it doesn't even get into the frequency regularity. Just the proximity. But you want to talk about proximity. Yes. It was issued that same year as Lorman. It actually came out afterwards. And it talks about how there needs – How is this – I'm sorry, Your Honor. No, I'm sorry. Go ahead. That rolling talks about how there – he has to be – there has to be proof that he was close enough within the vicinity that he breathed that dust such that there was even exposure at all. Because if there's no evidence that – on which the jury could conclude that there's even exposure at all, there's no question that needs to be raised about how much – Okay. Mr. Lim, but what if we do think that Lorman applies and we do look to Lorman? Then what is your argument? Well, Your Honor, there's – it's twofold. I think the first problem they have is I think we still come back to the Witherspoon testimony. Because the Witherspoon testimony is what – the only thing that they have that puts him within a certain vicinity, a certain proximity, and within any stated regularity. They say one – And I think the problem with the Witherspoon testimony is that it is, as the district court concluded, it's just a guess. It's Mr. Witherspoon's belief as to what Mr. Conner was doing and how he did it or not. Can I ask you something? Can I ask you something? Just assume for a minute that I'm focused on the part where Mr. Witherspoon says I'm not just basing this on my job. Also, I saw it. And also, I'm certain of this. So let's just assume for a second that we do have Mr. Witherspoon saying that Conner was within a few feet of the Daniel's asbestos work on a regular basis, one to three times a week and over a long period of time, and that there was at least some interaction with the workers. Would that be enough to meet Witherspoon in your – I'm sorry, to meet the Lorman test in your view? I don't think so, Your Honor. And I'll circle back to your question about the testimony. But assuming that – the premise of your question is that Mr. Witherspoon established that he was within one to three times – Well, not that he established it, but a reasonable jury could draw that inference. Yes, Your Honor. That's true. One to three times a week within two feet. I still think there's a lot of gaps there about how long he was there. And Mr. Conner himself says he didn't stand and watch them. I think there's a lot of gaps there about what they were doing, which Stretch Thacker points out. There's no testimony there about what the Daniel insulators were doing, when they interacted. If, again, we assume that they interacted one to three times a week within two feet. Because I think it's important to remember here, and Mr. Witherspoon doesn't contest this. It's uncontested. There's no professional connection between Mr. Conner and the Daniel installers. He was supervising trainers who trained people in the main purpose of this plant, which was polyester production. The Daniel installers were there performing what is essentially maintenance work on the insulation. So even if you take that statement as either observed fact or reasonable inference, I think it still doesn't get plaintiff to the regularity and frequency that a lot of gaps that the jury would have to fill in. And so I think, and if you look at Lorman, they said that the one to eight hours, 10 to 15 times, you can sort of multiply that on times in terms of minutes. That wasn't enough under Lorman to exceed the de minimis standards. So I think if we're in this area, then you have to entertain the plaintiff's argument that because this is a case, dial down the level of evidence of quantity that's required to get to a jury. And I think the problem for them there is, what is it that they want you to dial this down to? Lorman itself says it's a de minimis standard, right? There's got to be more than de minimis. So where else is there to go except to dial it down and say in the mesothelioma case, all you need is de minimis exposure. And I think the cases that we point to, the Ninth Circuit case in McIndoe, the Sixth Circuit case in Martin, the Seventh Circuit case in Crick, Texas Supreme Court in Bostick, the Pennsylvania Supreme Court in Bragg, they all say that this concept of de minimis exposure, that if that's the standard to get to a jury, that's irreconcilable with the concept of cancer causation, which is the causation level that's required under North Carolina law. I guess I am really wrestling with this, and I'll bet you can help me. Just as sort of a matter of logic, I don't really understand how the Lorman test could not be disease-specific. Because as you say, what it is is sort of an application of the general principle that you need the kind of exposure that would give rise to a reasonable inference of substantial causation. That's what you're looking for. And so how could it not matter how the disease transmits when you're trying to figure out how regular, how frequent over what period of time and how close you have to be to give rise to an inference that maybe that exposure is what caused your disease? We've all just lived this with COVID. You can't ask in a vacuum, am I close enough to my co-worker to give rise to a reasonable inference that I caught COVID from my co-worker without knowing something about the six-foot rule, right? That this is a disease that transmits within about six feet. How could it not turn, or as if it were measles, you could be 12 feet away and still get it. How could that not be relevant to figuring out how close is close enough, how frequent is frequent enough, and over how long a period is enough? Yes, Your Honor, I understand your question. Let me see if I can approach it. First, I think it's important to remember that what we're talking about here is just the minimum standard level of evidence that you need to get to summary judgment. I think it is certainly, no one here is contending that it's not relevant when a jury gets this question and is considering what degree of frequency, regularity, and proximity is required that the expert testimony, if it's admissible, will of course come into the jury's deliberation. Okay, so it should be in the jury instructions, we think. I think it, and that's obviously not the question here. I understand, yeah, but this is helpful. I don't think anybody is talking about that question here. What does the jury consider when they're sort of pulling those levers on frequency, regularity, and proximity? But the question that we have here is, it's not about where you fall on that, but what is the very minimum, right, that's required to even allow this question to go to the jury? And I think what Lorman says is, again, at least in asbestosis cases, that minimum standard is more than de minimis. And I think the question is, in a mesothelioma case, are you going to say that it's okay for that minimum standard to be lowered to de minimis? Because I think that's the only place to go. If Lorman says it has to be more than de minimis... I thought that was a good image, how it pulls the levers on proximity and everything else. Why wouldn't the question be, if a reasonable jury could find, in light of the nature of this disease and how it transmits, if a reasonable jury could pull the lever for, yes, this is close enough, this is frequent enough, and this is over a sustained enough period of time, it should go to a jury. That question should go to a jury. I'm sorry, Your Honor. Well, I think with that, it gets to the second part, which I wasn't able to get to, which is, I think there's still a legal element to this, which is, what does substantial causation mean, and what is the minimum that's required for substantial causation? That standard is still to have meaning. And, Your Honor, I think, and I don't want to go into detail with all of those cases, but I think if you look at those cases, in particular the Bostick case from Texas, and I think the Crick case from the Seventh Circuit, and maybe the McIndoe case of the Ninth Circuit, I think they explain well, this isn't entirely a science question when you're talking about the minimum standard that maintains some meaning for substantial causation and doesn't basically flip the burden such that defendants, because now every question is going to the jury on causation. The defendants are the ones that have to disprove causation. And I think in this particular case, too, another factor that they point out in those cases is, when you have a second source, a huge and undisputed second source, does substantial causation retain meaning if you allow, in the face of that, even the minimist exposures to go to the jury? And again, I think the Texas Supreme Court in Bostick explains this well. They say, look, just as a matter of law, as a matter of law, to ensure that substantial causation as a term and a legal element still has meaning, we have to require more than de minimis. Okay, I think I understand what you're saying, and I want to give everyone else a chance. So let me just, so you're saying that sort of it's a legal rule that even if de minimis exposure can cause the disease, you still can't go to a jury on de minimis exposure because that will just get us into a world of pain where like every employer will always be on the hook for everything. So even if there's a medical expert, a credible medical expert, even if we all know, let's say it's smallpox, like de minimis exposure is going to be enough to get you sick, you still can't go to a jury on de minimis exposure because the reasons you gave. Yes, Your Honor. I don't know that I would put it in a practical way, the world apart, but I think what those cases say, and I agree with them, I think it's persuasive, is that it essentially renders this concept of substantial causation meaningless. And I think that's exactly, so it is, I think. Mr. Lin, I don't know that I agree with that. I mean, it depends on the disease, right? It doesn't render it meaningless, it just applies it to the real world facts of the nature and the way in which a particular disease operates. And so it may be sui generis when it comes to mesothelioma, but there may be a different test when it comes to regular exposures not related to that particular disease. Your Honor, I think my answer to that, again, leaning on a lot of those other cases, I do think the disease matters, but I think you have to juxtapose that against this standard of what substantial causation means. And I think what those courts would say, and I think, again, the Texas Supreme Court says this explicitly, is that in order to ensure that it is both this question of law and science, and putting it together, that even in mesothelioma cases, irrespective of what the science says, although we have contested what the science says, we did file a Daubert motion on that, so I think there's that question as well. But what these other cases say is that in order to ensure that substantial causation retains some meaning, you can't lower that standard for summary judgment all the way down to the minimum. So let me just, so say, I'm very bad at hypotheticals, so this one probably won't make sense, but run with me. Say like some company is doing something with like very scary chemicals, and they're deadly chemicals, and if you are exposed to this chemical, everybody agrees, if you're exposed to it for two minutes, you're going to get very, very sick. And there's a chemical leak, and so anybody like walking by this company on the street is exposed to the chemical for long enough to get very sick. But it all happens in like three minutes. Like in three seconds, you just walk by, and that's enough. And all these people get really, really sick. And it's 100% clear that that de minimis exposure to the chemical both could and likely did cause their illness. But you would say like that's de minimis. I'm sorry. It was only a couple of seconds one time. You're not going to a jury on that. Is that where we are? Your Honor, I think, well, a couple answers to that. I think, one, I don't think the science is that clear on asbestos. But, two, I know, but this is a hypothetical. I understand you're right. And so, two, I think that's, I think, again, that's what court after court has said. But how can that, but if we're, how, but at least in North Carolina, right, the rule is substantial causation. And if it's clear that my de minimis exposure was a substantial cause of my illness, why can't I go to a jury? I mean, there might be some other reason, some other legal reason. But on causation, I can't go to the jury because it was de minimis? Your Honor, that's, again, I think if this court were to adopt that rule, it would be really contradictory to all of these cases. But I think, Your Honor, if I may, because I don't have a lot of time left, come back to the evidentiary question. I don't think this court needs to reach that issue in this case. Because I think that the evidence that we're talking about, Judge Harris, you asked me to assume for the sake of argument that he had seen this happen. There is one statement where he is asked, is this based on your observation of what Pete Connor did? He says yes. But if you, I think the question of what he understood by observation isn't clear when you read it in context. And if you look two pages earlier in the J.A., he's asked specifically about was, would you say Mr. Connor was near Daniel and Solaris? He says, I think so. And then he's asked, did you see him do that? If he doesn't answer yes, he says, I think this is something that both of us would have done in doing our job. He then goes on for the next four pages talking about the type of job that he did and why he reaches this guess about what Mr. Connor was doing. I don't think you have the evidence here that is any more than just his belief. And the question is, from the jury's perspective, does the jury have the facts that would allow them to draw this as a reasonable inference that Mr. Connor was near the Daniel installers one to three times a week, that he was within two feet, that he spent time around them. He stopped and watched them and that they were doing their work. And I think there's too many gaps in the evidence for a jury to reach that reasonable conclusion. So I think on that basis, you could conclude that there's not enough here to put him close enough, as Roland said, to conclude that he was breathing the asbestos dust. Because asbestos, your honors, is not like radiation. It's dust. It has to be inhaled. It's not everywhere in the plant. But surely he's not contending that. In a footnote in their reply brief, they say specifically, we're not saying that it was throughout the entire manufacturing. Their theory of exposure depends on two things. One, that there was airborne asbestos around the Daniel installers. And two, that there's enough evidence to put Mr. Connor close to it. And again, I think this is very much like the Pace case where the police force pointed to somebody's testimony where he said, I can't remember seeing him next to specific pumps, but I know he did it and I seen it. That's what the Pace testimony was. This court said that's speculative. To send that question to the jury, and Judge Harris, if you want to think about it as proximity under Lorman, or separately as an actual exposure question, I think under both standards, you don't have him close enough to even establish that there is this de minimis exposure. I think you don't have to reach in this case. I see my time has expired. Thank you. Ms. Shirley, you've got some time for rebuttal. Thank you. I wanted to quickly clarify that this is not a de minimis exposure case. Even though they were short exposures, they were quite high exposures. And one of the things that the trial court did not consider and was not challenged in any kind of dolbert way was our expert's opinion that Mr. Connor had frequent, recurring, and substantially elevated air concentrations of asbestos as a bystander at Viber. That is based on all these studies and everything that's in the record. But that's at JA 1899. So that opinion should give some comfort to you if you're doubtful that even these short exposures, if you think those aren't a lot, that medical evidence is that they are quite high and they are causative of people of mesothelioma and bystanders and family members. But the testimony out of Mr. Connor's own mouth is that when he saw Daniel International workers around the facility, he would not stand and watch them. And he didn't have any dealings with them or speak to them. They did their work and we did ours, he said. Well, he was somewhat internally contradictory on that. He did also talk about... Okay, I'm sorry. Go ahead. I was just going to say, as I pointed out before, he did testify about having a lot of direct contact with them in terms of helping them do repairs, giving them permission for repairs. And did you say that was how frequently? Well, he said that he saw them every day. I mean, there are some inferences that have to be drawn, but he said he saw them... I mean, that's right. We're not contesting that he primarily worked in the P building. But we are saying that even the times that he was around Daniel was enough to cause his disease. And that is in the record at 324, 326, and 27 where he's discussing those direct interactions that he had with Daniel workers. In terms of Witherspoon and his opinion, not only was it based on personal observation, it was also... Even the testimony based on the fact that he did a similar job we think is admissible. It is a lay opinion based on his personal perception, rationally based on the witness's perception, and helpful in determining a fact and issue. That's Federal Rule of Evidence 701. He knows the job. He'd seen it done. And he has authority and personal knowledge. And did I understand your answer to one of Judge Harris's questions correctly a while ago? Did you say that even if we don't consider mesothelioma, that you should prevail on summary judgment based on his exposure? Or do we have to consider mesothelioma as a disease for you to prevail? Well, Your Honor, I do think we prevail even if you don't consider it. But I think if you do consider it, that that is... We are encouraging the court to consider it because that is a relevant factor in determining whether those short exposures, how... If those would be positive. I was going to point the court to the Finch versus Koval opinion. And this court had affirmed the jury instruction that was given in that case. It was actually quite a similar case to this one. It was a mesothelioma case in which the patient had high finger exposure to Koval's high ventilation. And there, the district court had really been the one to draw the distinction. Those are mesothelioma. But the district court's instructions in Finch, those are quoted in this court's opinion at 972 F. 3rd, page 513. And those list out all the factors that the jury should consider, such as how much Koval insulation was in the plant and how close the plaintiff was to it, et cetera, et cetera. Those same factors I would encourage the court to use here in evaluating whether this exposure meets the Lorman test. Counsel, can I ask you, I just want to, just to clarify something you said. You're talking about the circumstances under which you would prevail on summary judgment. You're not asking us to say that the district court should have granted the plaintiff summary judgment, right? You're asking us to, you're saying this is enough to get you to a jury to defeat a motion for summary judgment. Okay, I just wanted to make sure. Okay. Absolutely. Sorry if I misinterpreted that. No, no, no. Clear from context. I just wanted to be certain. All right. I have one more small point to make. Would it be okay if I went on for another minute? Go ahead. Thank you so much. I just wanted to point out that the Bostick case that was mentioned by opposing counsel, that was not a Lorman case. Texas doesn't use Lorman. Texas uses a quantifier. They make you quantify your votes. Whereas, Lorman is a qualitative standard that most of us have observed. I just want to clarify that and also clarify that we are not relying on any and every exposure is a substantial factor in causing defeat. Our expert didn't say that and we're not arguing that. Thank you, Ms. Shirley. I want to thank counsel for their arguments. In this case, the matter is submitted. And we would, again, normally come down from the bench and greet you personally, but we can't do that. But, again, on behalf of the court, my thanks for your able presentations this afternoon. Be well and stay safe. Thank you very much.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris